1 Alexander M. Schack, Esq., (SBN 99126)
2 Natasha Naraghi, Esq., (SBN 284711)
LAW OFFICES OF ALEXANDER M. SCHACK
3 16870 West Bernardo Drive, Suite 400
San Diego, CA  92127
4 Telephone: (858) 485-6535
5 Facsimile: (858) 485-0608
6 alexschack@amslawoffice.com
natashanaraghi@amslawoffice.com
7
8 Attorneys for Plaintiffs and the
Proposed Plaintiff Class
9

# UNITED STATES DISTRICT COURT

10

# FOR THE DISTRICT OF SOUTHERN CALIFORNIA

11
12

| PATRICK SPRETER, individually and on behalf of all others similarly situated, | Case No. **'14CV0487 GPC KSC** |
|---|---|
| Plaintiffs, | CLASS ACTION |
| v. | COMPLAINT FOR: Violations of: Cal. Bus. & Prof. C. 17200, et seq., Cal. Bus. & Prof. C. 17500, et seq., Cal, Civ. C. 1750, et seq. |
| 23andMe, INC., a corporation. | |
| Defendant. | |
| | DEMAND FOR JURY TRIAL |

13
14
15
16
17
18
19
20
21
22
23
24
25        Plaintiff Patrick Spreter, an individual ("Plaintiff"), on behalf of himself and
26 all others similarly situated, by and through his undersigned counsel, files this
27 Class Action Complaint and alleges as follows:
28

## INTRODUCTION

1.     Plaintiff brings this action on behalf of himself and all others similarly situated against defendant 23and Me, Inc. ("23andMe" or "Defendant"), to obtain relief for the proposed class defined herein.

2.     The action is brought to remedy violations of law in connection with Defendant's design, manufacture, sale, marketing, advertising, and distribution of its Saliva Collection Kit/Personal Genome Service ("PGS"). Defendant marketed the PGS as a direct-to-consumer genetic test capable of offering customers disease predictions based on their DNA.

3.     Through its advertising and marketing, Defendant represented that the PGS provided reliable health reports for over 240 conditions that enabled consumers to learn their genetic risks for various diseases and conditions and plan for the future. For example, Defendant marketed the PGS as providing a risk assessment for diseases such as diabetes, coronary heart disease, and breast cancer. In addition, Defendant repeatedly stressed that consumers could provide the test information to their doctor to be used as a treatment tool.

4.     These representations, however, are misleading. According to a 2010 investigation by the United States Government Accountability Office ("GAO"), health practitioners "cannot keep up with the pace of genetic tests and are not

adequately prepared to use test information to treat patients appropriately."[1]   As such, the tests cannot reliably be used to support healthcare decisions.

5.      In addition, the test results lack usefulness, reliability, and accuracy because (1) the PGS does not account for numerous risk factors; (2) Defendant tests for a limited number of genetic markers; (3) there are inherent limitations in risk prediction based on genetic markers; and (4) the science in this area has not yet sufficiently evolved, among other reasons. According to leading genetic expert, James Evans MD, Ph.D., the tests "utterly lack medical significance."[2]

6.      Through its misrepresentations, Defendant has therefore misled consumers into believing they would be able to make medical decisions in reliance on the information provided through the PGS. By way of its misleading advertising and marketing, Defendant also deceived Plaintiffs and the Class into believing that the PGS could be used in the diagnosis, mitigation, and treatment of diseases and conditions.

7.      Due in part to Defendant's unlawful conduct, Plaintiff and the Class members purchased products they would not otherwise have purchased.  As such, Plaintiff and the Class members lost money and suffered injury-in-fact.

---

[1] U.S. Gov't Accountability Office, *Direct-To-Consumer Genetic Tests: Misleading Test Results Are Further Complicated by Deceptive Marketing and Other Questionable Practices*, GAO-10-847T, at 16 (2010) [hereinafter *GAO Study on DTC Genetic Tests*], *available at* http://www.gao.gov/products/GAO-10-847T

[2] *Direct-To-Consumer Genetic Testing And The Consequences To The Public Health: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. On Energy and Commerce*, 111th  Cong. 104 (2010) [hereinafter *Congressional Hearing*] (statement of James P. Evans MD, Ph.D, EIC, *Genetic in Medicine*, Byrson Professor of Genetics and Medicine, U. N.C. Chapel Hill)

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). Plaintiff alleges that the amount in controversy here exceeds $5,000,000 among the proposed nationwide Class, exclusive of interests and costs. Plaintiff further alleges that members of the proposed Class are citizens of a state different from Defendant.

9.     This Court has personal jurisdiction over Defendant because Defendant has its principal place of business in California, regularly conducts business in California, and has marketed, designed, and sold the PGS in California. Defendant conducted business in California with Plaintiff Patrick Spreter. Defendant therefore has sufficient minimum contacts with this state to render the exercise of jurisdiction by this Court in compliance with traditional notions of fair play and substantial justice.

10.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here and Defendant regularly does business here.

## PARTIES

11.     Plaintiff Patrick Spreter is a California citizen who resides in San Diego County, California.  In reliance on Defendant's representations about the Product, Plaintiff purchased a PGS for his personal use and not for resale from 23andMe's website http://www.23andMe.com in or around May of 2013. Based on

Defendant's representations, Plaintiff reasonably believed that the PGS would provide accurate and reliable information regarding his disease risks. In fact, however, the PGS was not as represented. Had Plaintiff known the true nature of the product, he would not have purchased the PGS. As such, Plaintiff lost money and suffered injury-in-fact as a result of purchasing Defendant's product.

12.   Defendant 23andMe, Inc., is a Delaware Corporation with its principal place of business in Mountain View, California. Defendant 23andMe markets, advertises, sells, and distributes direct-to-consumer ("DTC") genetic tests that purportedly use a customer's DNA to provide information about the person's ancestry, genealogy, disease risks, and inherited traits.

## FACTUAL ALLEGATIONS

**A. The History of 23andMe, Direct-to-Consumer Genetic Tests, and the PGS**

13.   23andMe was founded in or around April of 2006. Approximately a year and a half later, the company officially launched and began offering its PGS product directly to consumers in the United States. According to Defendant's own website, "23andMe, Inc. is a leading personal genetics company dedicated to helping individuals understand their own genetic information through DNA analysis technologies and web-based interactive tools."

14.   · 23andMe's product, the PGS, is a direct-to-consumer genetic test that purportedly provides consumers with DNA-based information about their inherited traits, disease risks, ancestry and genealogy from a saliva sample.   Upon

purchasing the PGS, the consumer is mailed a saliva sample collection kit, which includes a collection tube, a plastic specimen bag and instructions for the sample collection.  After spiting into the collection tube, the consumer's saliva sample is placed in the specimen bag and mailed in the original pre-addressed box that was received by the consumer.  When the sample is returned, Defendant allegedly extracts the customer's DNA from the saliva sample and uses it to test for numerous diseases and conditions.

15.   Approximately four to six weeks later, Defendant purportedly provides customers with a detailed profile of their results, which includes disease risk reports for approximately 240 diseases and conditions, along with information regarding their inherited traits, health risks, carrier status, drug response and ancestral composition, among other things. Once the test is complete, customers can access the purported result information, along with other "health tools" and features by logging on to Defendant's website.

16.   In or around 2007, direct-to-consumer genetic tests like the PGS were predominantly marketed as providing antiquity determinations. Since then, however, companies like 23andMe began making an increasing number of claims about various health risks which they claimed could be assessed through their product.

17.   As of late 2013, Defendant, the self-proclaimed leading personal genetics company, claimed that it could provide "health reports on 240+ conditions

and traits." Given their propensity to mislead consumers, the company's claims regarding its DTC genetic test have not only been the subject of an investigation by the United States Government Accountability Office ("GAO" or "GAO Report"), but also a key focus of the congressional hearing on Direct-To-Consumer Genetic Testing And The Consequences To The Public Health.[3]

**B. Through Its Advertising, Marketing, and Other Promotional Materials, Defendant Disseminated Misleading Statements Regarding The PGS**

18.     In marketing and advertising the PGS, Defendant misrepresented the medical value, usefulness, and reliability of its product.  In particular, Defendant misleadingly represented that its test information could be used as a treatment tool by medical practitioners.  Through its material misrepresentations, Defendant also led consumers to believe the PGS could accurately and reliably assess health risks for diseases like diabetes, Parkinson's disease, and breast cancer, among others.

19.     Some of the advertising and marketing statements featured on Defendant's website included:

a.   "23andMe is a DNA analysis service providing information and tools for individuals to learn about and explore their DNA."

b.   "Take a more active role in managing your health – Knowing how your genes may impact your health can help you plan for the future and personalize your healthcare with your doctor."

---

[3] See *GAO Study on DTC Genetic Tests*, *supra* note 1, at 8, 12; *Congressional Hearing*, *supra* note 2, at 87 (testimony of Gregory Kutz, Managing Director, Forensic Audits and Special Investigations, Gov't Accountability

7

c. "Be on the lookout now – Knowing your health risks will help you and your doctor figure out health areas to keep an eye on."

d. "Plan with your doctor – Personalize your healthcare by knowing in advance how you will respond to certain medications like Warfarin."

e. "Learn hundreds of things about your health. Using your DNA information, 23andMe helps you know more about your health so you can take an active role in managing it. With reports on over 240+ health conditions and traits, here are a few things you'll learn about you."

f. "Your 23andMe results can help you and your doctor make informed decisions about your healthcare."

g. "Learn valuable health & ancestry information."

h. "Drug response – Arm your doctor with information on how you might respond to certain medications."

i. "23andMe can help you manage risk and make informed decisions…"

j. "Health tools – Document your family health history, track inherited conditions, and share the knowledge."

k. "23andMe estimates your genetic chances of getting Type 2

Office).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Diabetes"

l.   "Below are a few examples [diabetes, arthritis, coronary heart disease, breast cancer, plavix, lactose intolerance] where we can help you learn more. And when you know more, you can make better lifestyle choices, look out for common conditions and take steps toward mitigating serious diseases."

m.   "Living well starts with knowing your DNA."

n.   "Plan for the future. Find out if your children are at risk for inherited conditions, so you can plan for the health of your family."

o.   "With type 2 diabetes rates increasing, it's more important than ever to know if you're at an elevated risk.  We'll help you find out the steps you can take to reduce your risk."

20.   Defendant also advertises specific diseases and conditions that the PGS can assess, stating that its DTC genetic test provides "[r]eports on 240+ health conditions." In addition, Defendant represented that customers would "[g]et personalized recommendations." Defendant further claimed, "[b]ased on your DNA, we'll provide specific health recommendations for you." In fact, however, the results provided have no medical value for consumers and cannot be relied on to implement health or lifestyle decisions.

21.   Through its misleading statements, Defendant intended to and did

deceive consumers into believing that the PGS was a reliable, accurate, and useful product for diagnosing, assessing, and/or treating various health risks, diseases, and conditions.

**C. The PGS Lacks Medical Significance and the *"Science"* Behind Defendant's DTC Genetic Test Does Not Support Its Claims**

22.     DNA (deoxyribonucleic acid) is a molecule containing the genetic information and instructions for the development and functioning of a living organism, such as a human.   A gene traditionally refers to a segment or unit of DNA that contains instructions for a specific protein or set of proteins, and affects biological characteristics.   Genotyping, on the other hand, is the process of determining variations in an individual's genetic makeup (or genotype).

23.     Defendant's genotyping technology for its PGS test is premised on assessing single nucleotide polymorphisms ("SNPs"). A single nucleotide polymorphism ("SNP") is a variation in a single DNA block.   Scientists estimate that there are roughly 10 million SNPs in the 3 billion nucleotides that make up a person's genome.

24.     While research on SNPs is still developing, scientists believe some SNPs may be linked with particular diseases.   Using SNPs as genetic markers, recent research has attempted to assess which markers occur more frequently in patients with certain diseases.   Given the limitations of current science, however, much is still unknown about SNPs. As a result, the implication of specific SNPs is unsettled. As such, the application of these genetic markers is extremely limited.

25.   Defendant's PGS, however, purports to assess disease risks by looking at just a fraction of the millions of SNPs in the human genome.  In fact, the various disease tests generally look at anywhere from just 1 to 15 markers in assessing specific health risks. Given the limited number of SNPs assessed and the current limitations of science, the results therefore lack medical significance.

26.   When the GAO researchers asked genetic experts about the accuracy of the markers and disease predictions of DTC genetic tests like those sold by 23andMe, they were told "that there are too many uncertainties and ambiguities in this type of testing to rely on any of the results.  Unlike well-established genetic testing for diseases like cystic fibrosis, the experts feel that these tests are 'promising for research, but the application is premature.'"[4] According to these experts, "the science of risk prediction based on genetic markers is not fully worked out, and … the limitations of this sort of risk prediction have not been adequately disclosed."[5]

27.   Contrary to Defendant's assertions that customers will receive valuable health information through the PGS, the results in fact lack any medical significance. In testimony before the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations, Doctor James P. Evans, who is board certified in Molecular Genetic Diagnostics and the Editor-in-Chief of

---

[4] *GAO Study On Genetic Tests, supra* note 1, at 8.
[5] *GAO Study On Genetic Tests, supra* note 1, at 8.

*Genetics in Medicine*, stated that the information provided by this type of testing "by and large, utterly lacks medical significance."[6]

28. Discussing the usefulness of DTC genetic tests, Gregory Kutz, the Managing Director of Forensic Audits and Special Investigations at the GAO, also told the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations "the genetic experts we spoke to said that most doctors would not be able to interpret [these tests]."[7]

29. Defendant's claims regarding the PGS therefore do not reflect the value of the information actually imparted. In particular, Defendant has misrepresented the reliability of the results and the ability of health care professionals to use the PGS results to assist in treating patients. Despite being aware of these limitations, Defendant continued to market its product with misleading representations about the usefulness, medical value, and benefits of the PGS. In April of 2013, for example, Defendant's website marketed the PGS by claiming that "[k]nowing how your genes may impact your health can help you plan for the future and personalize your healthcare with your doctor[,]" and that "[k]nowing your health risks will help you and your doctor figure out areas to keep an eye on." These statements, however, are wholly misleading in that Defendant's

---

[6] *Congressional Hearing*, *supra* note 2, at 104 (statement of James P. Evans MD, Ph.D, EIC, *Genetic in Medicine*, Byron Professor of Genetics and Medicine, U. N.C. Chapel Hill).
[7] *Id.* at 95 (testimony of Gregory Kutz, Managing Director, Forensic Audits and Special Investigations, Gov't Accountability Office).

product cannot be used as a diagnosis and treatment tool by medical professionals as represented.

30.    Speaking at the congressional hearing on DTC genetic tests, Representative Parker Griffith, who has been a physician for over 40 years, stated, "This is all bogus.  This is nothing more than the snake oil salesman revisited again in a high-tech community and in a high-tech way."[8]

31.    The 2010 GAO Report regarding DTC genetic tests also discussed Defendant's claims that consumers could bring test results to their physicians to be used as a treatment tool and cited such claims as an example of the deceptive marketing used in connection with DTC genetic tests. The report stated:

> According to the Department of Health and Human Services' Secretary's Advisory Committee on Genetics, Health, and Society, '[practitioners] cannot keep up with the pace of genetic tests and are not adequately prepared to use test information to treat patients appropriately.' Therefore, direct to consumer genetic tests may not provide any substantial utility to the consumer.[9]

32.    Thus, Defendant has misleadingly portrayed the accuracy, reliability, efficacy, and medical value of the PGS through its misrepresentations. As a result of Defendant's conduct, Defendant has been able to sell the PGS to thousands of unsuspecting consumers and profit handsomely from these transactions. Accordingly, Defendant's unfair or deceptive acts and practices have injured

---

[8] *Congressional Hearing*, *supra* note 2, at 24, 89 (testimony of Rep. Parker Griffith).
[9] *GAO Study On Genetic Tests*, *supra* note 1, at 15 -16.

Plaintiff and the Class members, who have lost money and suffered damages by purchasing the PGS.

## CLASS ACTION ALLEGATIONS

33.     Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this class action lawsuit on behalf of himself and all other members of the Class (the "Class") defined as follows:

> All persons residing in the United States who purchased 23andMe's Saliva Collection Kit/Personal Genome Service between January 1, 2007 and the present for their personal, use and not for resale.

34.     Excluded from the Class are: (1) all persons who purchased 23andMe's PGS for resale; (2) 23andMe and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (3) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (4) the Judge(s) assigned to this case and any members of their immediate families.

35.     **Numerosity**. Defendant sold the PGS throughout the United States. Plaintiff is informed and believes that the proposed putative class consists of tens of thousands of customers throughout the United States.  Due to the nature of the products and the commerce involved, Plaintiff believes that the Class is so numerous that joinder of all members is impractical.  While the precise numbers of

14

members are unknown to Plaintiff, this information can be ascertained through discovery.

36.     **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff and the Class members purchased the PGS from Defendant and have been injured by the same wrongful practices committed by Defendant.  Plaintiff's claims arise from the same practices or course of conduct that give rise to the claims of all Class members.

37.     **Commonality Questions Predominate.** Common questions of law and fact exist as to all Class members and predominate over any individual questions.   Some of the questions of law and fact common to Class members include, but are not limited to, the following:

     a.  Whether Defendant engaged in unlawful, unfair or fraudulent business acts or practices in connection with the design, manufacture, sale, marketing, advertising, or distribution of the PGS;

     b.  Whether Defendant used any unfair, deceptive, untrue, or misleading advertising in connection with the sale and distribution of the PGS;

     c.  Whether Defendant made any false and/or misleading claims or representations in its advertising, marketing, or other promotional materials in connection with the sale and distribution of the PGS;

15

d. Whether Defendant's conduct in advertising, marketing, selling and distributing the PGS violated California's Unfair Competition Law (Cal. Bus. & Prof. Code, § 17200 et seq.);

e. Whether Defendant's conduct in advertising, marketing, selling, and distributing the PGS violated California's Consumer Legal Remedies Act (Cal. Civ. Code, § 1750 et seq.);

f. Whether Defendant's conduct in advertising, marketing, selling, and distributing the PGS violated California's False Advertising Law (Cal. Bus. & Prof. Code, § 17500 et seq.)

g. Whether the members of the Plaintiff Class have sustained damages as a result of Defendant's conduct and, if so, the proper measure and appropriate formula to be applied in determining such damages;

h. Whether Defendant should be ordered to disgorge, for the benefit of the Class, all or part of the ill-gotten profits received from the sale of the PGS, or to make full restitution to Plaintiff and the Class members;

i. Whether members of the Plaintiff Class are entitled to restitution as a result of Defendant's conduct and, if so, the proper measure and appropriate formula to be applied in determining such restitution;

j.  Whether members of the Plaintiff Class are entitled to other equitable relief and, if so, the proper amount thereof;

k.  Whether members of the Plaintiff Class are entitled to injunctive relief as a result of Defendant's conduct and, if so, the appropriate form of such injunctive relief.

38.  **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Class members.  Plaintiff purchased the PGS during the Class period and is familiar with the basic facts that form the bases of the Class members' claims. Plaintiff is an adequate representative of the Class in that he has no interests which are adverse to or conflict with those of the Class members Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

39.  **Superiority.**  A class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical.  Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, especially given that the damages or injuries suffered by each individual member of the Class may be relatively small. Even if the Class members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments. By contrast, a class action

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

presents fewer management difficulties and provides the benefits of single adjudication and comprehensive supervision by a single court.

## FIRST CAUSE OF ACTION
### Violations of the California's Consumer Legal Remedies Act
### (California Civ. Code § 1770)

40.     Plaintiff hereby re-alleges and incorporates the allegations set forth in this complaint as if fully set forth herein.

41.     This cause of action is brought pursuant to the Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1770, et seq.).  The acts, practices, and omissions described herein were intended to result in the sale of goods to the consuming public.  These acts, practices, and omissions, violated and continue to violate the CLRA in that they constitute unlawful methods of competition, and unfair or deceptive acts undertaken in a transaction which resulted in the sale of goods to consumers.  Such acts and practices include, but are in no way limited to, representing that goods and services had sponsorship, approval, characteristics, benefits, uses, ingredients, or quantities which they do not have.

42.     At all times relevant hereto, Plaintiff and other Class members were "consumer[s]" as the term is defined in Civ. Code § 1761(d).

43.     At all times relevant hereto, the PGS constituted "goods" as the term is defined in Civ. Code § 1761(a).

44.     At all times relevant hereto, Defendant constituted a "person" as the term is defined in Civ. Code § 1761(c).

45.   At all times relevant hereto, Plaintiff's and other Class members' purchases of Defendant's PGS constituted a "transaction" as the term is defined in Civ. Code § 1761(e).

46.   By engaging in the conduct set forth herein, Defendant violated and continues to violate § 1770(a)(5) of the CLRA because Defendant, through its acts and practices, misrepresented and continues to misrepresent the characteristics, uses, quantities, and benefits of the PGS.

47.   By engaging in the conduct set forth herein, Defendant violated and continues to violate § 1770(a)(7) of the CLRA because Defendant, through its acts and practices, misrepresented and continues to misrepresent the standard, quality, and grade of the PGS.

48.   By engaging in the conduct set forth herein, Defendant violated and continues to violate § 1770(a)(9) of the CLRA because Defendant, through its acts and practices, advertised the PGS with the intent not to sell it as advertised.

49.   By engaging in the conduct set forth herein, Defendant violated and continues to violate § 1770(a)(16) of the CLRA because Defendant, through its acts and practices, represented and continues to represent that the PGS—the subject of a transaction with Plaintiff and other Class members—has been supplied in accordance with a previous representation when it has not.

50.   In purchasing Defendant's PGS, Plaintiff and other Class members relied on Defendant's acts, practices, and omissions, to their detriment.   Had

Plaintiff and the Class known about the true nature of the PGS, they would not have purchased Defendant's product. Plaintiff and other Class members were therefore deceived into purchasing Defendant's PGS as a direct and proximate result of Defendant's unlawful methods of competition and unfair or deceptive acts. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and other Class members have therefore suffered damages in an amount to be proven at trial.

51.     Pursuant to Cal. Civ. Code § 1782, on or about December 12, 2013, Plaintiff, on behalf of herself and other similarly situated consumers, notified Defendant through his counsel of the unlawful methods of competition, the unfair acts and practices, and the CLRA violations described herein by a certified letter which contained a demand that PGS cease and desist its unlawful conduct, offer to make appropriate restitution, and identify and notify affected consumers, among other things.

52.     Defendant has failed to provide appropriate relief for its violations of the CLRA within 30 days of its receipt of Plaintiff's letter.  Accordingly, pursuant to Cal. Civ. Code §§ 1780, 1782, Plaintiff seeks actual, punitive, and statutory damages, attorneys' fees and costs, and any other relief as the court deems appropriate.

53.     By engaging in the CLRA violations described herein, Defendant acted with fraud, malice, and oppression, and in conscious disregard of the rights

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

of Plaintiff and the Class members. As a result, Plaintiff and the Class members are entitled to punitive and exemplary damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Violations of the California's False Advertising Law
### (California Bus. & Prof. Code § 17500)

54.     Plaintiff hereby re-alleges and incorporates the allegations set forth in this complaint as if fully set forth herein.

55.     At all times relevant hereto, Defendant was and is a "person" as defined by Cal. Bus. & Prof. Code § 17506.

56.     This cause of action is brought for violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500-17536.5.

57.     Through the acts and practices described herein, Defendant engaged in a campaign of advertising and marketing the PGS to the public, including Plaintiff and the Class. Defendant's advertisements, commercials, marketing statements, and other promotional materials were disseminated to the public in California and throughout the United States. As set forth herein, Defendant's advertising, marketing, and other promotional materials contained untrue or misleading statements about the nature of the PGS.

58.     Through its advertising, marketing, and other promotional materials, Defendants made and disseminated untrue or misleading statements with the intent of inducing the public to purchase the PGS.

59. As set forth in herein, Defendant's statements and representations were misleading in that they were likely to deceive, and did deceive, the public.

60. In making and disseminating the advertising, marketing, and other promotional materials described herein, Defendants knew, or should have known, that its statements and representations about the PGS were untrue or misleading.

61. Plaintiff and the Class members purchased the PGS in reliance on Defendant's misrepresentations. Had Plaintiff and the Class members known the true nature of the PGS, they would not have purchased the product. As a direct and proximate result of Defendant's misrepresentations and false advertising, Plaintiff and the Class were deceived into purchasing the PGS.

62. As a direct and proximate result of Defendant's false and misleading advertising, Plaintiff and the Class members have lost money and suffered damages. Plaintiff further alleges that, as a direct and proximate result of Defendant's false and misleading advertising as alleged herein, Defendant has obtained a monetary benefit from Plaintiff and the Class members. As such, Defendant has been unjustly enriched at the expense of Plaintiff and the Class members.

63. Plaintiff and the Class therefore seek restitution, an order requiring Defendant to disgorge any monies wrongfully acquired by means of Defendant's false and misleading advertising, and any further relief that the court deems proper.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### THIRD CAUSE OF ACTION
### Violations of the California's Unfair Competition Law
### (California Bus. & Prof. Code § 17200)

64.     Plaintiff hereby re-alleges and incorporates the allegations set forth in this complaint as if fully set forth herein.

65.     Beginning at an exact date unknown to Plaintiff but at least since sometime in or around May of 2013, Defendant has committed and continues to commit acts of unfair competition, as defined by California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210.

66.     As specifically alleged herein, Defendant's acts and practices violate the California Consumer Legal Remedies Act, Cal. Civ. Code. § 1770, and the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, and consequently constitute "unlawful" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200

67.     Defendant's acts, and practices, as alleged herein, threaten a continued violation of consumer laws, including but not limited to the California Consumer Legal Remedies Act, Cal. Civ. Code, § 1770 and the California False Advertising Law, Bus. & Prof. Code, § 17500, violate the policy and spirit of such laws, and otherwise significantly harm consumers. Furthermore, Defendant's acts and practice of marketing, advertising, distributing, and selling the PGS while misrepresenting the nature and efficacy of the product is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm to

Plaintiff, the Class, and members of the general public substantially outweighs any benefits of Defendant's conduct. Consequently, Defendant's acts and practices constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200.

68.     Defendant's acts and practices are likely to deceive, and did deceive, Plaintiff, the Class, and members of the general public and, consequently, constitute "fraudulent" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200. Through the untrue and misleading statements contained in Defendants advertising, marketing, and other promotional materials, Defendant mislead Plaintiff, the Class, and members of the general public about the nature, efficacy, and suitability of the PGS for its intended purpose.

69.     Defendant's advertising, marketing, and other promotional materials, also constitutes unfair, deceptive, untrue and misleading advertising. As alleged herein, Defendant's advertising, marketing, and other promotional materials contained claims, statements, and representations that were false, misleading, and/or likely to deceive the public.

70.     Had Plaintiff and the Class members known the true nature of the PGS, they would not have purchased Defendant's product.  Accordingly, Plaintiff and other Class members purchased the PGS in reliance on Defendant's unlawful, unfair, and fraudulent business acts and practices, and its unfair, deceptive, untrue, or misleading advertising. Plaintiff and the Class were therefore deceived into

purchasing the PGS from Defendant as a direct and proximate result of Defendant's unlawful, unfair, and fraudulent business acts and practices.

71.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members have suffered injury in fact and have lost money by purchasing the PGS.

72.    Defendant has thus engaged in unlawful, unfair, and fraudulent business acts and practices, and unfair, deceptive, untrue or misleading advertising in violation of Cal. Bus. & Prof. Code § 17200.  As a direct and proximate result of Defendant's conduct, Defendant has received ill-gotten gains and has been unjustly enriched at the expense of Plaintiff and the Class members.

73.    Plaintiff and the Class therefore seek restitution, an order requiring Defendant to disgorge any monies wrongfully acquired by means of Defendant's false and misleading advertising, and any further relief that the court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all persons and consumers similarly situated, prays for judgment against Defendant as follows:

1.    An order certifying the Class defined herein, designating Plaintiff as representative of said Class, and appointing the undersigned counsel as Class Counsel;

2.    An order requiring full restitution of all amounts obtained by Defendant as a result of its misconduct in an amount according to

proof at trial, plus pre and post-judgment interest thereon;

3.     For all recoverable compensatory, consequential, actual and/or statutory damages in the maximum amount permitted by law;

4.     For punitive and exemplary damages in amounts according to proof at trial;

5.     For other equitable relief;

6.     For prejudgment interest as provided by law;

7.     For costs of suit incurred herein;

8.     For payment of reasonable attorneys' fees and costs pursuant to Civil Code section 1780(e), Code of Civil Procedure section 1021.5, and other statutes as may be applicable;

9.     For all such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

PLAINTIFFS hereby demand a jury trial on all issues so triable, as provided by Rule 38 of the Federal Rules of Civil Procedure.

Date: March 4, 2014               Respectfully submitted,

/s/ Natasha A. Naraghi
Natasha A. Naraghi, Esq.
Law Offices of ALEXANDER M.SCHACK
16870 W. Bernardo Drive, #400
San Diego, CA 92128
(858) 485-6535  (858) 485-0608 fax
natashanaraghi@amslawoffice.com